CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
February 23, 2026
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SHAWN TOLBERT, ) | |
|     Plaintiff, ) | Case No. 7:23-cv-00530 |
| ) | |
| v. ) | |
| ) | By: Michael F. Urbanski |
| KARL H. KLETZING, et al., ) | Senior United States District Judge |
|     Defendants. ) | |

### MEMORANDUM OPINION

Shawn Tolbert, an inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 against multiple doctors and nurses at LewisGale Hospital Pulaski ("LewisGale"), a privately owned hospital in Pulaski, Virginia. Tolbert was taken to the emergency room ("ER") at LewisGale on August 30, 2022, after being arrested. He claims that the defendants acted with deliberate indifference to his serious medical needs by allowing him to be discharged from the ER the following day rather than providing additional medical treatment. The case is presently before the court on the defendants' motions for summary judgment. ECF Nos. 62 and 64. Because the court concludes that the challenged actions were not taken under color of state law for purposes of § 1983, the motions for summary judgment are **GRANTED**.

### I.     Factual Background

The following facts from the summary judgment record are either undisputed or presented in the light most favorable to Tolbert. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A.    **LewisGale and the Defendants**

LewisGale is part of the HCA Virginia Health System. The hospital is "a privately owned and operated facility with no public government ownership or affiliation." Pressman Decl. ¶ 3, ECF No. 64-6. The hospital contains an ER. Id.

At the time of the events giving rise to this action, LewisGale had enacted a policy titled "Virginia EMTALA – Medical Screening Examination and Stabilization Policy, NUR618CP." (the "EMTALA Policy"). ECF No. 62-3 at 1.* The EMTALA Policy "reflects guidance under the Emergency Medical Treatment and Labor Act" ("EMTALA"), 42 U.S.C. § 1395dd, and establishes guidelines for providing appropriate medical screening examinations and necessary stabilizing treatment as required by EMTALA. Id.

In August 2022, defendants Karl Kletzing, M.D., Erin Dove, M.D., and Saqib Shah, M.D., worked as emergency room physicians at LewisGale, and Erica Waddle, D.O., worked as a hospitalist at LewisGale. Drs. Kletzing, Dove, and Shah were independent contractors for Kingsford Emergency Group, LLC ("Kingsford"), and they provided emergency medical care in LewisGale's ER pursuant to a contract between LewisGale and Kingsford. Kletzing Decl. ¶¶ 3–4, ECF No. 64-2; Dove Decl. ¶¶ 3–4, ECF No. 64-3; Shah Decl. ¶¶ 3–4, ECF No. 64-4. Dr. Waddle was an employee of National Hospitalist Services, PC, and she provided medical care at LewisGale pursuant to a contract between LewisGale and her employer. Waddle Decl. ¶¶ 3–4, ECF No. 64-5.

In August 2022, defendant Adetokunbo Ladenika, M.D., a board-certified psychiatrist, was employed by Lewis Gale, as were defendants Lisa Barber, R.N., Jacqueline

---

\* The court will cite to medical records and other exhibits using the docket and page numbers assigned by the court's CM/ECF system.

2

Taylor, R.N., and Denise Haun, R.N. Ladenika Decl. ¶¶ 3–4, ECF No. 62-4; Barber Decl. ¶¶ 4–5, ECF No. 62-6; Taylor Decl. ¶¶ 4–5, ECF No. 62-7; Haun Decl. ¶¶ 4–5, ECF No. 62-8. Defendant Hunter Frank, R.N., worked for a privately owned nursing company that contracted with LewisGale, and she provided nursing care and treatment in LewisGale's ER pursuant to that contract. Frank Aff. ¶¶ 4–5, ECF No. 62-5.

LewisGale "does not currently, and did not in August 2022, have an agreement or contract with the Virginia State Police or any other police department to provide medical care and treatment to its arrestees or pretrial detainees." Pressman Decl. ¶ 11. Likewise, none of the defendants had a contractual relationship with any correctional facility or police department to provide medical care for arrestees or pretrial detainees. See Kletzing Decl. ¶ 12; Dove Decl. ¶ 12; Shah Decl. ¶ 12; Waddle Decl. ¶ 11; Ladenika Decl. ¶ 4; Frank Decl. ¶ 5; Barber Decl. ¶ 5; Taylor Decl. ¶ 5; Haun Decl. ¶ 5.

**B.    Tolbert's Treatment at LewisGale**

Tolbert arrived in the ER at LewisGale at approximately 4:25 p.m. on August 30, 2022, after being arrested by police officers. ECF No. 62-2 at 23. Police officers reported that Tolbert had barricaded himself in a trailer when they attempted to execute outstanding warrants and that tear gas, flashbang grenades, a police dog, and a taser had been employed to detain him. Id. at 13. Dr. Kletzing was the ER physician who examined Tolbert upon his initial arrival. Dr. Kletzing noted that Tolbert was "not verbal and not following commands," but that he had stable vital signs. Id. at 13–14; Kletzing Decl. ¶ 19. Dr. Kletzing ordered a complete work-up, including laboratory tests and imaging studies. Kletzing Decl. ¶ 19.

3

Nurse Taylor assisted with the triage process after Tolbert arrived in the ER, and Nurse Haun was present for the initial assessment performed by Dr. Kletzing. ECF No. 62-2 at 23. Beginning at approximately 5:00 p.m., Nurse Barber was responsible for monitoring Tolbert's vital signs. Id. at 25.

Tolbert subsequently underwent a chest x-ray and CT scans of the cervical spine, all of which were normal. Kletzing Decl. ¶ 20. The results of the laboratory tests were also within normal limits. Id.

Based on Tolbert's stable vital signs and normal test results, Dr. Kletzing initially planned to discharge him from the ER. Id. At 6:16 p.m., Dr. Kletzing entered a discharge note indicating that Tolbert's condition was "stable and appropriate for discharge." ECF No. 62-2 at 20. Approximately 30 minutes later, however, Dr. Kletzing entered a patient addendum noting that Tolbert was "not currently conversant and not responding to tactile/verbal stimuli." Id. Similarly, Nurse Haun noted that Tolbert remained silent and would "not respond [to] noxious painful stimuli applied by Dr. Kletzing and Dr. Waddle." Id. at 30. Nurse Haun also noted that Tolbert's vital signs remained normal and that "state police [were] at [his] bedside." Id.

After speaking with Dr. Waddle, Dr. Kletzing planned to transfer Tolbert to another facility for additional medical treatment, including neurological services. Kletzing Decl. ¶ 22. By that time, Dr. Kletzing's ER shift had ended, and he was replaced by Dr. Shah, who served as the night shift ER physician. Id. ¶ 24. At approximately 7:30 p.m., Dr. Shah noted that Tolbert had been accepted as a transfer to the Wake Forest Baptist Health neurology department. ECF No. 62-2 at 21. However, a subsequent notation indicates that Tolbert

4

could not be transferred out of state because of his criminal charges. Id. at 38. Consequently, Tolbert remained in the ER overnight from August 30, 2022, to August 31, 2022. Id. at 21–22.

At approximately 9:20 p.m. on August 30, Nurse Frank described Tolbert's "[p]resenting signs/symptoms" as "unresponsive to verbal stimuli." Id. at 26. She noted that Tolbert could not correctly answer questions or obey commands. Id.

Dr. Shah's shift ended around 6:30 a.m. on August 31, 2022, and Dr. Kletzing returned for his day shift around the same time. At 7:41 a.m., Dr. Kletzing noted that Tolbert was "responding to questioning with head shaking but still not conversant." ECF No. 64-7 at 24. At approximately 9:00 a.m., Dr. Kletzing ordered a psychiatry consultation and spoke to Dr. Ladenika. Id. During their conversation, Dr. Kletzing and Dr. Ladenika discussed that Tolbert may be experiencing catatonia, and Dr. Ladenika recommended that Tolbert be given Ativan, a prescription benzodiazepine commonly used for catatonia treatment. Ladenika Decl. ¶¶ 8–9. After conferring with Dr. Ladenika, Dr. Kletzing ordered Ativan for Tolbert. Kletzing Decl. ¶ 29; ECF No. 64-7 at 24.

According to Dr. Kletzing, Tolbert's "condition in terms of functionality vastly improved after he received Ativan." Kletzing Decl. ¶ 30. At approximately 1:45 p.m., Dr. Kletzing noted that Tolbert was "now sitting up in bed, drinking from a straw, following commands and moving all 4 extremities." ECF No. 64-7 at 25. Around the same time, Nurse Haun noted that Tolbert had still not spoken but that he was responding with eye movement, following commands, and taking small sips of a soft drink. ECF No. 62-2 at 31.

5

Dr. Ladenika examined Tolbert in the ER at approximately 2:30 p.m. on August 31, 2022. Ladenika Decl. ¶ 10. At that time, Tolbert was "doing some eye tracking" and weakly shook his head when asked certain questions. ECF No. 62-2 at 43–44. However, he remained nonverbal and would not respond to questions regarding his psychiatric history. Id. at 44. Dr. Ladenika noted that Tolbert's presentation "was consistent with nonmalignant retarded catatonia with elements of mutism, inhibited moment with severe psychomotor retardation, rigidity, negativism, and staring." Id. at 45. He recommended "starting with . . . Ativan" and then arranging for "medical transfer . . . to Carilion inpatient PACU/ICU" the following morning if "no progress ha[d] been made with current treatment modalities." Id. at 43. He also noted that they could "consider transfer to Carilion psychiatry via the Medical hospitalist service and schedule for emergency ECT treatment." Id.

Around the same time, Dr. Kletzing conferred with Dr. Ladenika and Dr. Waddle. Kletzing Decl. ¶ 29; ECF No. 64-7 at 25. Dr. Kletzing documented Dr. Ladenika's treatment recommendations, including Ativan and admission to an intensive care unit ("ICU"). ECF No. 64-7 at 25. After speaking with Dr. Waddle, Dr. Kletzing learned that there were no ICU beds available at LewisGale. Id. Consequently, he contacted LewisGale's transfer center and asked that an ICU "bed search" be initiated for Tolbert. Id. At approximately 3:15 p.m., Dr. Kletzing noted that he had spoken to the transfer center again and that no ICU beds were available at the four Virginia hospitals contacted by the transfer center. Id.

At around 6:40 p.m., Nurse Haun reported that Tolbert had eaten 100% of his meal unassisted and was having a conversation with her. ECF No. 62-2 at 32. Tolbert told Nurse Haun that he worked in construction but could not recall his name. Id.

6

After Dr. Kletzing's shift ended that evening, Dr. Dove took over as the night shift ER physician. At around 7:30 p.m., Dr. Dove documented that she had spoken to Tolbert's mother, who reported that he had a history of "hallucinations and delusions" and that he had appeared increasingly confused over the past two months. ECF No. 64-7 at 25. Tolbert's mother also reported recent "bizarre" behaviors exhibited by Tolbert, including "burning his cellphone" and "talking to people who were not there." Id. Dr. Dove then examined Tolbert again and noted that he was "awake, eating, [and] able to answer questions verbally." Id.

Tolbert was discharged from the ER at approximately 8:30 p.m. by Dr. Dove. Dove Decl. ¶ 27. Dr. Dove's declaration indicates that she determined that Tolbert "was in stable condition and did not require further treatment." Id. At the time of discharge, Nurse Taylor listed the outcome of Tolbert's chief complaint as "[s]tabilized/maintained." ECF No. 62-2 at 28. She also noted that verbal and written discharge instructions were viewed with "Trooper Smith" and that Tolbert left the ER with the officer. Id. at 32. The "departure information" referred to a "conversion reaction" and described Tolbert's condition as "stable." Id. at 34.

## II.   Procedural History

Tolbert subsequently filed this civil rights action under 42 U.S.C. § 1983 against the doctors and nurses mentioned in the records from his ER visit. In his amended complaint, Tolbert claims that each of the defendants acted with deliberate indifference to his serious medical needs by allowing him to be discharged from the ER without receiving adequate

7

medical treatment. See Am. Compl., ECF No. 12. Tolbert alleges that he was "still injured" at the time of discharge and that he should have been admitted to an ICU. Id. at 6.

In response to the amended complaint, the defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). The court denied the defendants' motions on March 31, 2025. See Mem. Op and Order, ECF Nos. 47 and 48. The court noted that the defendants could reassert their arguments on a more fully developed record. Mem. Op. at 11.

The defendants have since filed motions for summary judgment supported by declarations, medical records, and other evidence. ECF Nos. 62 and 64. Tolbert has responded to the motions, see ECF Nos. 66 and 68, and the motions are ripe for review.

### III. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. To survive summary judgment, there must be sufficient evidence from which a reasonable finder of fact could return a verdict in the nonmoving party's favor. Id. at 252. "Conclusory or speculative allegations do not suffice to oppose a properly supported motion for summary judgment, nor does a mere scintilla of evidence." Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (internal quotation marks omitted).

## IV. Discussion

The defendants make two arguments in support of their motions for summary judgment. First, the defendants argue that they did not act under color state law when treating Tolbert in the ER at LewisGale on August 30 and 31, 2022. Second, the defendants argue that Tolbert is unable to establish that they acted with deliberate indifference to any serious medical need. The court will focus its analysis on the first argument, which the court concludes is dispositive of Tolbert's claims against all nine defendants.

### A. Summary of Applicable Law

The federal statute under which Tolbert filed suit, 42 U.S.C. § 1983, "imposes liability on state actors who cause the deprivation of any rights, privileges, or immunities secured by the Constitution." Loftus v. Bobzien, 848 F.3d 278, 284 (4th Cir. 2017) (internal quotation marks omitted). To prevail under § 1983, a plaintiff must establish "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

"[T]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999) (quoting Blum v. Yaretsky, 457 U.S. 991, 1002 (1982)). "Consequently, 'the person charged must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that the non-state actor is engaged in the state's actions.'" Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 615–16 (4th Cir. 2009) (alterations omitted) (quoting DeBauche v. Trani, 191 F.3d 499, 506 (4th

9

Cir. 1999)). In determining whether a defendant acted under color of state law, the "ultimately inquiry" is whether "there [is] a sufficiently close nexus between the challenged actions" of the defendant and the state such that the defendant's actions "may be fairly treated as that of the State itself." Mentavlos v. Anderson, 249 F.3d 301, 314 (4th Cir. 2001) (internal quotation marks omitted). This determination is "a question of law for the court," which may be decided on summary judgment. Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 344 n.7 (4th Cir. 2000); see also Yassin v. Weyker, 39 F.4th 1086, 1089–90 (8th Cir. 2022) (explaining that questions of law, including the under-color-of-state-law determination, "may be resolved by summary judgment provided there are no genuine issues of material fact in dispute") (internal quotation marks omitted).

The Supreme Court "has articulated a number of different factors or tests in different contexts" for determining when a private party acts under color of state law. Lugar v. Edmondson Oil Co. 457 U.S. 922, 939 (1982). For instance, the Court has held that a private party may be found to have engaged in state action "when [the challenged action] results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents." Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 296 (2001) (internal quotation marks and citations omitted). The Court has also recognized that "a private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to [the] private entity," Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 810 n.1 (2019), or when the government is "entwined in [the private entity's]

10

management or control." Brentwood Acad., 531 U.S. at 296 (internal quotation marks omitted). The Court has emphasized, however, that the criteria for finding state action "lack rigid simplicity" and that "no one criterion must necessarily be applied." Id. at 295, 303. Likewise, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." Id. at 295–96. Ultimately, courts must "consider the totality of the circumstances of the relationship between the private actor and the state to determine whether the action in question fairly is attributable to the state." Peltier v. Charter Day Sch., Inc., 37 F.4th 104, 116 (4th Cir. 2022) (en banc).

In the context of medical treatment provided to individuals in state custody, the Supreme Court's decision in West v. Atkins provides "some guidance for determining when nongovernmental health care providers that serve state prisoners should be considered state actors." Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 824 (7th Cir. 2009). That case presented the question of "whether a physician who is under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis acts 'under color of state law,' within the meaning of 42 U.S.C. § 1983, when he treats an inmate." West, 487 U.S. at 43. The respondent in West was a private physician who provided orthopedic services to inmates pursuant to a contract with the State of North Carolina. Id. at 44. The Court held that, "as a physician employed by North Carolina to provide medical services to state prison inmates," the respondent "acted under color state of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury." Id. at 54. In reaching its

11

decision, the Court focused on the function that the physician voluntarily performed on behalf of the state, rather than the particular terms of the physician's contract:

> It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, physician, and the prisoner. Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights. The State bore an affirmative obligation to provide adequate medical care to West; the State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract.

Id. at 55–56.

Several years later, the United States Court of Appeals for the Fourth Circuit concluded that the Supreme Court's analysis in West "applies also to private physicians who treat state prisoners without the benefit of a contract." Conner v. Donnelly, 42 F.3d 220, 225 (4th Cir. 1994). In Conner, a state prison physician referred an inmate to an outside orthopedist for treatment. Id. at 221–22. The orthopedist was employed by a private medical center, and neither the orthopedist nor his employer had a contractual relationship with any correctional facility. Id. Nonetheless, the orthopedist examined and treated the inmate on four occasions. Id. The Fourth Circuit held that the orthopedist acted under color of state law by accepting the inmate as a patient and providing him with medical care, even though the orthopedist had no employment or contractual obligation to accept the inmate as a patient. See id. at 226 ("We hold that a private physician who treats a prisoner upon referral by the state, and who knows that the patient is a prisoner, voluntarily assumes the state's

12

obligation to provide medical care to inmates."). The court emphasized that "[t]he state bears an affirmative obligation to provide medical care to inmates" and that "when it delegates that duty to a physician who voluntarily assumes that obligation, that physician acts under color of state law." Id.

In reaching its decision, the Fourth Circuit distinguished the district court's decision in McIlwain v. Prince William Hospital, 774 F. Supp. 986, 989–90 (E.D. Va. 1991), which, like this case, involved medical care provided in the ER at a private hospital. The plaintiff in McIlwain, while incarcerated at a state correctional facility, was rushed to the ER after overdosing on heroin. Id. 988. The district court held that a private hospital's "mere acceptance of a prison inmate for emergency care does not transform the hospital into a state actor." Id. at 990. In Conner, the Fourth Circuit agreed that the hospital in McIlwain did not voluntarily accept the prison's duty to provide medical care by merely admitting the inmate to its ER. Conner, 42 F.3d at 228. Although the Fourth Circuit found it unnecessary to affirmatively decide "whether evidence that a physician did not voluntarily accept a state's delegation of constitutional duties should affect a court's state action analysis," the Fourth Circuit noted that McIlwain was distinguishable from West in that respect and that the holding in McIlwain was "not inconsistent" with its decision in Conner. Id. at 228.

In the more than 30 years since Conner and McIlwain were decided, other courts have addressed whether private medical providers acted under color of state law when providing emergency medical treatment to an inmate or detainee. Appellate courts have emphasized that "private parties do not automatically become 'state' actors simply by caring for prisoners," particularly when such care is provided in a hospital's emergency department.

13

Phillips v. Tangilag, 14 F.4th 524, 533 (6th Cir. 2021) (citing Rodriguez, 577 F.3d at 827–28); see also Peters v. Brown, 793 F. App'x 118, 124 (3d Cir. 2019) ("Nurse Adams is not a state actor for purposes of § 1983 merely because Peters was under arrest when the Brookville police officers brought him to the hospital for evaluation prior to taking him to jail."). As the Seventh Circuit recognized in Rodriguez, emergency medical systems have "a preexisting obligation to serve all persons who present themselves for emergency treatment." Rodriguez, 577 F.3d at 827. Specifically, under EMTALA, a hospital that has an emergency department is required to screen an individual to determine whether he has an emergency medical condition, 42 U.S.C. § 1395dd(a), and, if so, the hospital must either provide "for such further medical examination and treatment as may be required to stabilize the medical condition" or transfer the individual to a different facility, id. § 1395dd(b)(1). EMTALA was enacted "to prevent patient dumping, a practice by which hospitals would either refuse to provide emergency medical treatment to patients unable to pay for treatment or transfer those patients before their emergency medical conditions were stabilized." Williams v. Dimensions Health Corp., 952 F.3d 531, 534 (4th Cir. 2020). Based on the statutory obligations imposed by EMTALA, the Seventh Circuit concluded that the fact that a hospital must serve all individuals who present to the hospital for emergency treatment, including those in state custody, "does not mean that it has agreed to step into the shoes of the state and assume the state's responsibility toward [incarcerated] persons." Rodriguez, 577 F.3d at 828. Accordingly, the Seventh Circuit held that a hospital and its staff did not act under color of state law merely by providing medical treatment to a state inmate in the hospital's emergency department. Id. at 831 & n.20.

14

Multiple courts have reached the same decision in similar contexts. See, e.g., Stratton v. Buck, 498 F. App'x 674, 676 (9th Cir. 2012) (affirming the district court's decision that a physician did not act under of color state law when providing emergency medical care to an inmate); Styles v. McGinnis, 28 F. App'x 362, 364 (6th Cir. 2001) (agreeing with the district court that a doctor who provided emergency staffing services to a hospital as an independent contractor did not become a state actor by examining a state inmate in the emergency room); Thomas v. Mohiuddin, No. 2:23-cv-1524, 2025 WL 2028684, at *7 (E.D. Wis. July 21, 2025) (concluding that a doctor and a nurse were not state actors capable of being sued under § 1983 where an inmate was treated in an emergency department as required by EMTALA); Est. of Newman v. Bd. of Cnty. Comm'rs of the Cnty. of Montezuma, No. 1:22-cv-01763, 2025 WL 947482, at *7 (D. Colo. Mar. 28, 2025) ("Most courts that have addressed cases involving a detainee's treatment at the emergency room have held that a doctor does not become a state actor by treating a prisoner at an emergency room . . . . The Court agrees that an emergency room doctor's treatment cannot be considered voluntary when the doctor is under a legal obligation from EMTALA to provide that care."); Smith v. Thornton, No. 5:17-cv-03045, 2019 WL 1009439, at *3 (E.D.N.C. Feb. 7, 2019) (holding that an emergency room physician did not act under color of state law in treating a prisoner brought to the ER), report and recommendation adopted, 2019 WL 1003633 (E.D.N.C. Feb. 28, 2019); Ward v. Cnty. of Mendocino, No. 4:17-cv-0911, 2017 WL 3007063, at *11 (N.D. Cal. July 14, 2017) (concluding that a complaint failed to allege facts sufficient to show that a physician became a state actor purely by virtue of providing emergency medical care to a county inmate and noting that the physician "arguably had no choice about treating [the inmate], given the

15

requirements of EMTALA"); Sykes v. McPhillips, 412 F. Supp. 2d 197, 204 (N.D.N.Y. 2006) (holding that a physician who provided medical care to an inmate in a private hospital's emergency department, "which he was obligated under law to provide," was not a state actor for purposes of § 1983).

By contrast, another judge in this district previously rejected an ER physician's argument that he did not act under color of state when treating a state inmate. Whitten v. Atyia, No. 7:17-cv-00465, 2019 WL 1430005, at *8 (W.D. Va. Mar. 29, 2019). The judge noted that the defendant relied on his employment status as an independent contractor with a private corporation that contracted with various hospitals to provide ER physicians. Id. In finding "no merit to this argument," the judge reasoned that when the physician treated the inmate, "he 'assume[d] the state's constitutional obligation to provide medical care to its prisoners' and thereby 'exercise[d] power that is traditionally the exclusive prerogative of the state.'" Id. (quoting Conner, 42 F.3d at 224–25). Consequently, the judge declined to grant the physician's motion for summary judgment on the ground that he was not a state actor and instead determined that the physician was entitled to summary judgment on the merits of the inmate's Eighth Amendment claim. Id. at *8–10. Notably, however, it does not appear that the defendant argued that he had a preexisting obligation under federal law to screen and treat all individuals who entered the hospital's emergency department, including those in state custody, and, thus, the judge did not consider whether the requirements imposed by EMTALA distinguish an ER physician from a physician "who voluntarily assumes the state's obligation to provide medical care to inmates." Conner, 42 F.3d at 226.

16

**B.     Analysis**

Having reviewed the record and applicable law, the court concludes that the defendants did not act under of color of state law in taking the actions giving rise to this action. In reaching this conclusion, the court first notes that the facts in this case are plainly distinguishable from those in West and Conner. Unlike the private physician in West, neither LewisGale nor any of the defendants had contracted with the state or any other governmental entity to provide medical care to inmates or detainees. Thus, they did not "voluntarily assume[] . . . by contract" the government's obligation to provide adequate medical care to Tolbert. West, 487 U.S. at 54. Similarly, unlike the situation in Conner, no police department, correctional facility, or other governmental entity specifically referred Tolbert to the doctors and nurses named as defendants. Instead, the defendants simply happened to be on duty during the window of time in which Tolbert was examined and treated in the ER of a private hospital. See Phillips, 14 F.4th at 534 (distinguishing the circumstances in Conner from those in Scott v. Ambani, 577 F.3d 642, 649 (6th Cir. 2009), in which the court held that an oncologist "who cared for [a] prisoner by happenstance because the referral had been to the hospital [where she had staff privileges]" did not act under color of state law in treating the prisoner).

Additionally, there is no evidence that any of the defendants voluntarily accepted Tolbert as a patient or voluntarily assumed the state's obligation to provide him with medical care while he was in custody. To the contrary, the undisputed evidence establishes that the defendants were required to assess, treat, and stabilize Tolbert under EMTALA and LewisGale's EMTALA Policy, regardless of whether he was brought to the ER by a law

17

enforcement officer or a private individual. See 42 U.S.C. § 1355dd; EMTALA Policy, ECF No. 62-3, at 1 ("An EMTALA obligation is triggered when an individual comes to a dedicated emergency department ('DED') and . . . the individual or a representative acting on the individual's behalf requests an examination or treatment for a medical condition . . . . If an [emergency medical condition] is determined to exist, the individual will be provided necessary stabilizing treatment, within the capacity and capability of the facility, or an appropriate transfer as defined by and required by EMTALA . . . . Stabilization treatment shall be applied in a non-discriminatory manner . . . ."). Thus, the mere fact that the defendants examined and treated Tolbert while he was in the ER "does not mean that [they] agreed to step into the shoes of the state and assume the state's responsibility" to provide him with medical care while he was in custody. Rodriguez, 577 F.3d at 828. As the Seventh Circuit observed in Rodriguez, "an emergency medical system that has a preexisting obligation to serve all persons who present themselves for emergency treatment hardly can be said to have entered into a specific voluntary undertaking to assume the state's special responsibility to incarcerated [or detained] persons." Id. at 827. Consequently, the court agrees with the majority of courts that have considered the question that private "physicians, nurses, and hospitals are not state actors merely because they provide emergency medical care to an inmate [or detainee]." Smith v. Sedighi, No. 3:25-cv-1100, 2026 WL 234506, at *4 (S.D. Cal. Jan. 28, 2026).

The court also notes that there is no other evidence from which it could conclude that "the specific conduct of which the plaintiff complains . . . is fairly attributable to the state." Peltier, 37 F.4th at 120 (internal quotation marks and alterations omitted); see also

18

Brentwood, 531 U.S. at 295 ("[S]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.") (internal quotation marks omitted). The conduct of which Tolbert complains involves medical decisions made by medical providers at a private hospital, particularly the decision that Tolbert was stable enough to be discharged from the ER and did not require further emergency care or inpatient treatment. There is no evidence that the challenged action resulted from coercion or significant encouragement by the state or that the state was "entwined in [the defendants'] management or control." Brentwood Acad., 531 U.S. at 295 (internal quotation marks omitted). Instead, the record reflects that Dr. Dove made the decision to discharge Tolbert after personally evaluating him and determining that "he was in stable condition and did not require further treatment." Dove Decl. ¶ 27. While Tolbert obviously disagrees and believes that his condition remained serious enough that he should have been admitted to an ICU, there is no evidence that the state played any role in the decision to discharge him from the ER. See Blum, 457 U.S. at 1012 (concluding that private nursing homes' decisions to discharge or transfer Medicaid patients to lower levels of care did not rise to the level of state action where there was no evidence demonstrating that the state was responsible for the particular decisions at issue, which ultimately turned on "medical judgments made by private parties according to professional standards that are not established by the State").

Finally, the court notes that the fact that Tolbert left the ER in state custody upon being discharged does not convert the defendants into state actors. Even assuming that the officers accompanying him tacitly agreed with the discharge decision, "[m]ere approval of or

acquiescence in the initiatives of a private party is insufficient" to establish that a private party acted under color of state law. Philips v. Pitt Cnty. Mem. Hosp., 572 F.3d 176, 181 (4th Cir. 2009) (internal quotation marks omitted).

### IV. Conclusion

For the reasons stated, the court concludes that there is no genuine issue of material fact concerning whether the defendants acted under color of state as required by § 1983 and that the defendants are entitled to judgment as a matter of law on this issue. Accordingly, the defendants' motions for summary judgment are **GRANTED**.

Entered: February 23, 2026

Michael F. Urbanski
U.S. District Judge
2026.02.23
12:10:57 -05'00'

Michael F. Urbanski
Senior United States District Judge